O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

| Present: The Honorable | A. HOWARD MATZ, U.S. DISTRICT JUDGE | | |
|---|---|---|---|
| Stephen Montes | Not Reported | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys **NOT** Present for Plaintiffs:   Attorneys **NOT** Present for Defendants:

**Proceedings:**   IN CHAMBERS (No Proceedings Held)

## ORDER GRANTING IN PART AND DENYING IN PART A9.COM'S SUMMARY JUDGMENT MOTION

## I.   INTRODUCTION

The parties are familiar with the history of this case and the proceedings on Defendant A9.com's summary judgment motion. On October 27, 2008, the Court orally issued a bench ruling granting A9.com's motion for summary judgment that it did not directly infringe or vicariously infringe the copyrights of Plaintiff Perfect 10, Inc. ("Perfect 10"). The Court incorporates by reference its oral findings and statement of reasons at that hearing.

This order sets forth the Court's ruling on the remainder of A9.com's motion, concerning its assertion that it is entitled to safe harbor in Title II of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512(a). Defendant's evidentiary objections are addressed in an accompanying order. For the reasons stated below, the Court finds that A9.com has not met its burden of establishing that it is eligible for section 512(a) safe harbor and thus DENIES its motion as to that issue.

The Court thus GRANTS IN PART and DENIES IN PART A9.com's motion for summary judgment.[1]

---

[1] Docket No. 132.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

## II. LEGAL STANDARDS FOR A MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex*, 477 U.S. at 322).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id*. Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.*; *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III. DISCUSSION

This ruling is necessarily abbreviated, given the Court's caseload and the extremely time-consuming burden of adjudicating Perfect 10's claims in three related cases.[2] The parties are familiar with the basic facts of the case. Only the facts material to this motion will be recited here. For clarity, the Court will refer to the defendant as "A9" and to the website it operates as "A9.com."

### A. A9 Is Not Entitled to Summary Judgment Based Only on the Section 512(a) Safe Harbor, Given That Perfect 10's Claims Are Based on Multiple Functions

A9 operates what looks like a search engine at <www.A9.com>, but actually it aggregates search results provided by other search engines (such as Google, Alexa, or MSN). Pl.'s Supp. Statement of Uncontroverted Facts ("SGI") ¶ 1.[3] A9 then relays the search results received from those search engines to the end user. SGI ¶¶ 1-5.[4] As Perfect 10 explains the basis for its claim, several aspects of A9's search functionality and

---

[2] The other cases are *Perfect 10, Inc. v. Google, Inc.* (CV 04-9484) and *Perfect 10, Inc. v. Microsoft Corporation* (CV 07-5156). Several discovery motions and another summary judgment motion already are pending and complex case management issues remain to be resolved.

[3] Per the Court's October 6, 2008 order, Perfect 10's Supplemental Statement should have been entitled "Revised Statement of Genuine Issues." Thus the Court will refer to it as the "SGI."

[4] Perfect 10 disputes that A9 "only aggregates search results" but does not dispute that A9 does not crawl or index the World Wide Web. SGI ¶ 1.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

search results allegedly contribute to infringement: A9's creation of a "See full-size image" link and in-line link; its display of Perfect 10's passwords and links to password hacking websites; its creation of Web Search links and cache links; its creation of email links; its display of infringers' advertisements; and its display of thumbnails.

The DMCA contains four safe harbors that can limit liability for four different functions that Internet service providers (ISPs) may perform: Section 512(a) limits the liability of ISPs when they do nothing more than transmit, route, or provide connections for material; section 512(b) protects ISPs for "system caching," that is, where they provide intermediate and temporary storage of material on a system or network under certain conditions; section 512(c) limits the liability of an ISP for material "residing on [the ISP's] system or network at the direction of its users;" and section 512(d) protects an ISP performing an "information location tool" function that merely links users to online locations containing material. *See* 17 U.S.C. § 512(a)-(d). The first safe harbor, § 512(a), does not have a notification and takedown requirement. The other three safe harbors do. *See id.*

Under the DMCA, if an ISP is found to qualify for safe harbor for one function, that does not mean it enjoys blanket protection for all of its functions. The safe harbors "describe separate and distinct functions." 17 U.S.C. § 512(n). As Congress explained in an extended example set forth in the legislative history, an ISP may be engaged in multiple functions at the same time, each of which must be analyzed under the corresponding subsection of section 512. *See* H.R. REP. 105-551 (II) (1998), at 65 (explaining that an ISP that provides a hyperlink to a site containing infringing material which it then caches (*i.e.*, stores) on its system in order to facilitate access to it by its users may attempt to seek safe harbor for (1) transitory digital network communications under subsection(a), (2) system caching under subsection (b), and (3) information location under subsection (d), depending on which functions the copyright infringement claim is based on); 3 Melville B. Nimmer, *Nimmer on Copyright* § 12B.06[A] (2008) (quoting same). The Ninth Circuit took note of the "separate and distinct functions" feature of the DMCA in Perfect 10's lawsuit against CCBill when it noted that "[e]ven if CCBill's provision of a hyperlink is immune under § 512(n), CCBill does not receive blanket immunity for its other services." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007).

O

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

Although A9 has asserted various safe harbors as affirmative defenses, on this motion it seeks summary judgment concerning only one: section 512(a), for its transmission of search results. A9 contends that it is a passive conduit for the search results generated by whatever search engine it used. A9 recognizes, however, that it is also an information location tool within the meaning of § 512(d), by virtue of its provision of search services and access to other websites through links. *See* Reply at 17-18. It follows that even if A9 prevailed on its section 512(a) defense, it would not thereby obtain "blanket immunity" for its other functions covered by different safe harbors. *See id.*

### B. No Genuine Factual Dispute Whether A9 Reasonably Implemented A Repeat Infringer Policy

To be eligible for any of the four safe harbors at 17 U.S.C. §§ 512(a)-(d), a service provider must first meet the threshold conditions set out in section 512(i). The first condition is that the service provider

> [H]as adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C. § 512(i)(A). The second condition is that the service provider "accommodates and does not interfere with standard technical measures." *Id.* § 512(i)(B). Perfect 10 does not dispute that A9 fulfills the second condition. SGI ¶ 16.

Perfect 10 does dispute whether A9 satisfies the first condition, the so-called repeat infringer policy. Based on the evidence before the Court, the Court holds that no reasonable juror could find that A9 does not have a repeat infringer policy that satisfies section 512(i).[5]

---

[5]Perfect 10 raised this repeat infringer argument in opposition to A9's summary judgment motion, asking the Court to find that factual questions remain concerning A9's repeat infringer policy and to deny on that ground A9's motion regarding § 512(a) safe harbor. Although it is A9's ultimate

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

    1. "Implementation" of a repeat infringer policy.

    In its analysis of section 512(i) in *CCBill*, the Ninth Circuit asked first whether defendant implemented a repeat infringer policy, and then whether it *reasonably* implemented that policy. 488 F.3d 1102, 1110-11. It wrote that "a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications." *Id.* at 1109. Although the statute allows a variety of procedures for dealing with notifications, the court went on, "an implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright." *Id.* (quoting 17 U.S.C. § 512(i)(A)).

    A9 has provided evidence that it does have a "working notification system" for dealing with complaints of copyright infringement arising from its website, A9.com. Included in A9.com's Conditions of Use is a "Notice and Procedure for Making Claims of Copyright Infringement," which is posted on the website. SGI ¶ 15. Perfect 10 does not challenge this showing; it merely argues that A9 has never actually removed or disabled access to infringing material.

    That A9 has received and processed notifications submitted to it is supported by the declaration of A9's Vice President of Product Development, Jonathan Leblang, who was responsible for dealing with infringement notices. He stated that A9 has received just three notices of infringement and that he personally responded to each of those notices to the apparent satisfaction of the complainants. Declaration of Jonathan Leblang ¶ 5 (Declaration of Mark T. Jansen, Ex. 1). *Cf. Ellison*, 357 F.3d at 1080 (holding that AOL did not reasonably implement a termination policy when it "allowed notices of potential copyright infringement to fall into a vacuum and to go unheeded.") Although Leblang's declaration was submitted in 2005, Perfect 10 does not directly dispute that portion of his declaration and it has not attempted to depose Leblang.

---

burden to show that it satisfies the threshold requirements in section 512(i) in order to avail itself of any of the safe harbors, it did not request summary adjudication on that issue. To resolve the question A9 did put before the Court, whether it is entitled to summary judgment based on section 512(a), the Court necessarily must reach the section 512(i) issue.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

The uncontroverted evidence shows also that A9 had "a policy that provides for the termination in appropriate circumstances of subscribers and account holders. . .who are repeat infringers." 17 U.S.C. § 512(i)(A). The only "subscribers" or "account holders" on A9.com were those users who subscribed to the "Toolbar" service, from early 2004 to the end of September 2006. SGI ¶¶ 17-18. Toolbar users were subject to an End User License Agreement that gave A9.com the right to monitor subscribers' activities, investigate any reported violation of its policies, and take any action it deemed appropriate, including terminating subscribers' access to Toolbar. SGI ¶ 19. Perfect 10 does not dispute this evidence concerning Toolbar.

Perfect 10 nevertheless argues that there is a genuine issue of material fact whether A9 even had a repeat infringer policy because *Amazon's* corporate counsel testified she did not know about A9's policies, and because *Amazon's* copyright agent did not know what a repeat infringer policy was. SGI ¶ 36. This argument is patently meritless. What Amazon's employees knew or did not know is irrelevant to A9, because the two entities handled copyright issues separately, as Amazon's corporate counsel explained. *See* SGI ¶ 36.

Perfect 10 also relies on the deposition testimony of A9's software engineer, Matthew Amacker. Amacker testified that he did not know what the legal term "repeat infringer policy" meant. Declaration of Jeffrey N. Mausner ("Mausner Decl.") (Amacker Dep. 35:11-13). Perfect 10 suggests that it is incredible that Amacker would be unfamiliar with that legal term because he was designated as the person most qualified to testify for A9 regarding A9's compliance with section 512(i). SGI ¶ 67. Although Amacker did not understand the reference to "repeat infringer policy," he did testify that A9 had "a policy that allows us to terminate folks if they are doing something wrong." Def't's Application to File Exhibits Under Seal, Ex. 6 (Amacker Dep. 6:18-20). In any event, the DMCA does not require that a service provider label its policy a "repeat infringer policy." *See Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1101 (W.D. Wash. 2004) ("Although Amazon does not use the term 'repeat infringer' or precisely track the language of the DMCA, the evidence shows that Amazon has adopted a termination policy as required under § 512(i).") That Amacker did not know the legal term "repeat infringer policy" does not cast into doubt the documentary evidence establishing that A9 did have a "working notification system" for copyright complaints and a policy providing for termination of subscribers.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

2. <u>Reasonableness of A9's implementation of its policy.</u>

Perfect 10 contends that whatever policy A9 had, it was not reasonably implemented because A9 never removed or disabled access to infringing websites. But the Court need not reach the issue whether A9 terminated infringers in the abstract, because its "policy is unreasonable only if [it] failed to respond when it had *knowledge* of the infringement." *CCBill*, 488 F.3d at 1113 (emphasis added). Although A9 has the ultimate burden of proving its affirmative defense, it is Perfect 10's burden to show that A9 had actual knowledge of infringement within the meaning of section 512(c). As the Ninth Circuit's analysis in *CCBill* made clear, it is Perfect 10 that must show that A9 knew about "flagrant and blatant copyright infringement by its users." *Id.* at 1111 (noting that "a service provider need not affirmatively police its users for evidence of repeat infringement."). This knowledge can be established by (1) actual knowledge, (2) awareness of facts or circumstances from which infringing activity is apparent, or (3) receipt of notification of claimed infringement meeting the requirements of § 512(c)(3). *Id*. *But see Nimmer on Copyright* § 12B.10[B][3][c] (suggesting actual knowledge may not be required in cases involving an "adjudicated copyright infringer").

Although Perfect 10 was given the opportunity to demonstrate that A9 had such knowledge, it failed to do so. It provided no evidence of A9's knowledge of any specific repeat or blatant infringer of copyrights among its subscribers or account holders. Perfect 10 does point to a DMCA notice dated January 21, 2005 that Dr. Zada sent to *Amazon*, via Amazon's designated copyright agent, Adrian Garver, complaining of infringing porn sites that Dr. Zada found using the Amazon search functionality. Supplemental Declaration of Dr. Norman Zada ¶ 3, Ex. 31. On its face that notice is immaterial, as it is a notice sent to Amazon. Perfect 10's own papers suggest that it sent DMCA notices only to Amazon. *See* SGI ¶¶ 36-37, 40. There is no evidence of any notice sent to A9's copyright agent at A9's legal department, as A9's Notice and Procedure for Making Claims of Copyright Infringement instructs, and no evidence of any notices complaining of websites found using the A9.com search functionality.

Perfect 10 does point to A9's Clickriver Ads program as supposed evidence of A9's relationship with infringers. Clickriver is a web advertising program run by A9. It operates separately from the A9.com search functionality. Declaration of Gil Sheinfeld ¶ 2. Perfect 10 argues that A9 should have terminated the advertising relationships -- *i.e.*,

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

placement of sponsored links -- it had with "usenet" websites such as giganews.com and newsrazor.net that are alleged massive infringers. This argument is misdirected, for two reasons.

First, the sponsored links on A9.com that Perfect 10 cites are not actually part of the Clickriver program, so those links are not the result of a subscriber or account relationship that A9 could terminate. A9 has made clear that the sponsored links on A9.com are *not* placed by Clickriver. None of the usenet websites that Perfect 10 points to has ever been a Clickriver subscriber. *Id.* ¶ 6. Clickriver subscribers' ads are placed on Amazon.com and other websites, *not* on A9.com, a fact that is consistent with even Perfect 10's evidence. *See* SGI ¶ 56; Declaration of Dr. Norman Zada ("Zada Decl."), Exs. 15, 29; *see also* Ex. 11 (showing usenets as sponsored links on A9.com, but not showing that Clickriver placed those sponsored links). The mere fact that these usenets' sponsored links are on A9.com does not establish that A9.com had a "business relationship" with the usenets that could be terminated. H.R. REP. 105-551 (II) at 61 n. 3, cited in *Nimmer on Copyright* § 12B.10[D][1].

Second, even assuming Clickriver was responsible for the placement of usenet websites' sponsored links on A9.com, there is no evidence that A9 knew that these websites are repeat infringers. Perfect 10 has proffered no evidence that it or any other copyright holders provided DMCA notices alerting A9 to the fact that the usenet websites contained infringing images. *See CCBill*, 488 F.3d at 1113 (remanding for consideration of defendants' response to notifications from non-party copyright holders). Nor is it apparent from the usenets' sponsored links on A9.com that the usenets are massive infringers. *See* Zada Decl., Ex. 11. Absent evidence that A9 knew that these usenets contained infringing images and failed to take appropriate action, A9 cannot be found to have failed to reasonably implement its policy for purposes of section 512(i).

### C. A9 Has Not Shown It Qualifies for the Section 512(a) Safe Harbor (Transmission of Search Results) Because Genuine Issues Exist Regarding Whether It Retains and Modifies Search Results

Entitled "Transitory digital network communications," section 512(a) limits the liability of an ISP for "infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections," provided that the ISP meets four conditions:

> (1) the transmission of the material was initiated by or at the direction of a person other than the service provider;
> (2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;
> (3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;
> (4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and
> (5) the material is transmitted through the system or network without modification of its content.

17 U.S.C. § 512(a). These five requirements "limit the range of activities that qualify under this subsection to ones in which a service provider plays the role of a 'conduit' for the communications of others." H.R. REP. 105-551 (II) at 51; *see also Ellison v. Robertson*, 357 F.3d 1072, 1081 (9th Cir. 2004) (noting that the issue is whether AOL functioned as a "conduit service provider").

Here, the question is whether A9 may limit its liability if the infringement occurs "by reason of" its transmission of search results from an underlying search engine to the user. 17 U.S.C. § 512(a). Based on the evidence submitted by both sides, the Court holds that Perfect 10 has raised genuine issues of material fact concerning two of the five prerequisites for this safe harbor: the requirement in section 512(a)(4) that "no copy of the material" is maintained on A9's system "for a longer period than is reasonably necessary for the transmission," and the requirement of section 512(a)(5) that "the material is transmitted through the system or network without modification of its

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

content."

    1. Evidence concerning "Toolbar" creates a genuine issue regarding section 512(a)(4).

  Section 512(a)(4) would disqualify a service provider that stored a copy of the material on its system "for a longer period than is reasonably necessary for the transmission, routing, or provision of connections." 17 U.S.C. § 512(a)(4). The operation of A9's search functionality generally would not trigger this exclusion, because it does not involve the retention of search results longer than the fraction of a second it takes to convert such results from the format (XML) in which A9 receives them into HTML format and then to pass them on to the user. SGI ¶ 9. But when A9 operated its Toolbar service (early 2004 to end of September 2006), A9 *did* store search queries and results. In a 2004 press release, A9 referred to itself as a "search engine with a memory. . . . Users can view and edit past search results and sites they've visited by clicking on Search History on the A9 Toolbar. . . ." SGI ¶ 52. A9 admits that for Toolbar users it maintained users' past search queries and search results in its history server. SGI ¶¶ 24-25. It does not argue that this storage of information was merely "intermediate and transient storage." U.S.C. § 512(a). Thus, to the extent that A9 could be liable for infringement during the period that Toolbar was in operation, it has not satisfied section 512(a)(4).

    2. A9 has not established its compliance with section 512(a)(5).

  Section 512(a)(5) requires that "the material is transmitted through the system or network without modification of its content." 17 U.S.C. § 512(a)(5). The statute does not define "modification" and "content." The legislative history, however, notes that this provision does not pertain to modifications of the "form" of the material, citing as an example an e-mail transmission that appears to the recipient without bolding or italics resulting from format codes contained in the sender's message. H.R. REP. 105-551 (II) at 52.

  In its initial papers, A9 flatly asserted that it "does not delete from, add to, modify, filter or edit search results." In response, Perfect 10 pointed out various aspects of A9.com's search results that suggested that A9's assertion was inaccurate. The Court has

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

grouped them into four categories: (1) A9 added "see full-size image" links, sponsored links, links for framing or in-line linking, and email links; (2) for Toolbar, A9 recommended search results based on the user's search history and added certain text and links to the search results page; (3) A9 provides search results that are different in kind, in number, and in the order in which the results are displayed from the results that a user gets by doing the same search on the underlying search engine; and (4) the URLs that are provided in A9's search results appear truncated, compared to the URLs displayed by the underlying search engine, and there are differences in layout and fonts between the providers. *See* Opp'n at 17; Zada Decl. ¶¶ 16-19.

The first and fourth categories of purported modifications are easily disposed of. The Court has already ruled that A9's linking activities are part of its function as an "information location tool," so the addition of links should not be considered in the section 512(a) analysis. As for differences in the appearance of URLs, such as the omission of "http://," A9 has established those differences are in the format, not content, of the URLs. *See* Supplemental Declaration of Matthew Amacker ("Supp. Amacker Decl.") ¶¶ 4-6, 8-9, Ex. 1. The same goes for differences in layout and fonts.

The second and third aspects of A9's search results, however, do raise triable issues as to whether they constitute modifications of content. As A9 now admits, for Toolbar users, it added a second column of search results representing the results retrieved from its "history server." The second column was displayed next to the first column, which contained results from the underlying search engine. SGI ¶ 24. A9 nonetheless contends that addition of the second column does not constitute a "modification" under section 512(a)(5) because the user's stored search results were not mixed with the regular search results. A9 also argues that the second column should be disregarded because the transmitted "material" at issue in this case is only the regular search results containing links to infringing images.

The distinction A9 draws between the two columns of search results is not convincing. A9 cites no authority for the legal proposition that this kind of an "addition" of content to the transmitted material is not a "modification." Indeed, by adding a second column of search results to the results received from the search engine, A9 changed the overall *content* provided to the user. This sets A9 apart from the conduit service that AOL provided in *Ellison v. Robertson*, 189 F. Supp. 2d 1051, 1072 (C.D. Cal. 2002),

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

*rev'd in part on other grounds*, 357 F.3d 1072 (9th Cir. 2004). AOL's usenet servers simply transmitted newsgroup messages precisely as they were received from another usenet server. Moreover, A9 is not correct that Perfect 10's copyright claim is based only on the regular search results; Perfect 10's infringement claim is based on *all* of the content A9 provided to the user, regardless of whether A9 was relaying content indexed by an underlying search engine or whether A9 served the content from its own "history server." A9's addition of content to the transmitted material is inconsistent with section 512(a)'s limitation of protection to providers that are mere conduits for material.

     Furthermore, Perfect 10 has provided uncontroverted evidence of differences in the search results using A9.com compared to the results for the identical search on the underlying search engine. Zada Decl. ¶¶ 16-17. The differences are not minor. In one recent search, for example, A9.com yielded a total of four results, while Alexa.com, A9's current search engine provider, reported total results of about 948,000, and only one of the top six results on Alexa.com matched any of the A9.com results. *Id.* ¶ 17, Ex. 6. When Google was the search engine provider, there also were differences in the number and order of results. Zada Decl. ¶¶ 18-19 (citing examples of searches from August 2005). In response, A9 asserts that those differences are *not* due to A9's conduct, citing the testimony of Matthew Amacker. He testified that A9 "does not modify," "reorder" or add "extra links or [] extra text" to the search results provided by the underlying search engine. Def't's Application to File Exhibits Under Seal, Ex. 6 (Amacker Dep: 164:1-25). Amacker did not, however, provide a factual explanation for the apparent differences in search results. He merely speculated about why the underlying search engine might want to provide different results to A9 than it would provide on its own website. *Id.* (Amacker Dep: 127:6-13); Supp. Amacker Decl. ¶ 3. Given A9's failure to provide a non-speculative explanation for the differences in search results, and given that all justifiable inferences must be drawn in Perfect 10's favor, A9 has not met its burden of establishing the absence of a genuine issue of fact on the modification of content issue.

//
//
//
//
//
//

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 05-4753 AHM (SHx) | Date | November 4, 2008 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. AMAZON.COM, INC., *et al.* | | |

## IV.  CONCLUSION

     For the foregoing reasons, the Court holds that there is no genuine issue of material fact regarding A9's compliance with section 512(i); it does comply.  However, there *are* genuine issues regarding two of the requirements of section 512(a).  Thus, the Court denies A9's motion for summary adjudication that it is entitled to section 512(a) safe harbor.

                                                                             :

                                      Initials of Preparer                SMO